### THE TRANSFER NO. 3.

(District Court, S. D. New York. February 8, 1899.)

COLLISION—OVERTAKING BOATS—BREAKDOWN—ACCIDENT WITHOUT FAULT.

The tug M. overtook and passed Transfer No. 3 with her heavy tow coming down the East river off pier 16. The M. after passing in ahead of No. 3 and when about 500 feet in advance of her, broke her valve stem so that she became disabled. When soon afterwards the breakdown was discovered, danger signals were given to the tow behind, and shouts, and the tug was turned to go into the docks, but her way was gone, and collision ensued; on contradictory evidence, *held*, that No. 3 had no notice that the M. was disabled until the boats were too near to avoid collision in the flood tide, and that the collision was an accident without fault.

In Admiralty. Collision.

James J. Macklin, for libelant.

Henry W. Taft, for claimant.

BROWN, District Judge. On the 7th day of May, 1898, Transfer No. 3, belonging to the New Haven Railroad Company, coming down the East river against the flood tide, with a large car float about 250 feet long on each side of her and from 200 to 400 feet outside of the line of the New York piers, ran into the stern of the libelant's tug H. D. Mould, doing some damage for which the above libel was filed. The tug had previously been astern of Transfer No. 3 and was coming down at the rate of about seven miles an hour, having no tow. She overhauled and passed the Transfer and her tow to the eastward, and after passing them hauled in front of the tow until, when off Tenth street and being then several hundred feet ahead of the tow, her valve stem suddenly broke, by which she was disabled, as her propeller could not be turned either forward or backward. A minute or two elapsed before the nature of the trouble was discovered by the engineer, when he reported to the captain, who then gave several alarm signals, and shouts were also given from the stern of the tug to the tow behind. No 3 reversed, but not in time to avoid collision.

It is evident that the charge of negligence against No. 3 in not backing sooner, depends wholly on the time when she had notice that the tug was in trouble and must be avoided. The witnesses for No. 3 say that this was not until she was off Twelfth street, which was about 250 feet above the place of collision, which was off Eleventh street. If that is correct, it is plain there was insufficient time for the Transfer to stop, as the tug was drifting up river with the tide.

The witnesses for the Mould, on the other hand, testify in a general way that several danger signals were sounded when No. 3 and her tow were off somewhere from Fourteenth to Sixteenth street. I have no doubt that this is an error. The collision took place after dark at about half past 7, and the precise position of the tow above would not naturally be very exactly located; and the testimony of the masters of the Mould and No. 3 is, that the Mould passed the float off Sixteenth street; so that at the time when the Mould broke down off Tenth street, No. 3 could not have been above Twelfth or Thirteenth street, where the latter's witnesses testify she was.

Other circumstances still further corroborate the conclusion that No. 3 had no notice that anything was the matter with the Mould until the tow was within 200 or 300 feet of her. The order of events is testified to very naturally by the Mould's witnesses. Ratel says:

"The first engineer shouted to the captain to put his wheel over and sheer into the dock; that the engine was broken down. Of course I ran out of the pilot house back aft and commenced to shout."

The master says:

"Just as quick as I found out that there was something wrong with the engine, that was broken down, I put my wheel hard over and tried to go to the dock, but my way was gone."

As the Mould was going at the rate of seven or eight miles an hour through the water when she broke down, plainly there must have been quite a little interval before her way was gone; and this agrees with the time necessary for the previous examination made by the engineer before he reported the breakdown to the captain, and consequently before there was any shouting or signaling. But the captain still further states that his attention was not called to No. 3 and her tow until he saw her backing 50 or 100 feet away, and that, he says, was the time when they first commenced to hollo. The lookout on the starboard float of No. 3 states that this was the first notice he had of trouble with the Mould, and that she gave no alarm signals until about that time; and there is no probability that alarm signals were given by the captain of the Mould to the tow behind before his attention was called to it; and from the above circumstances and the Mould's own testimony, it is evident that No. 3 was then pretty near, probably 200 feet off, instead of 50 or 100, but too near then to avoid collision.

It is plain from the master's testimony that he did not know that the Mould was disabled until "her way was about stopped"; because it was then that the engineer reported and told him to port his wheel in order to run in towards the docks; but her way being nearly gone, she could do no more than turn a little to starboard, still remaining

in the path of No. 3. Being previously ahead of No. 3 and going at a speed of seven or eight knots through the water, it would have been very easy for the Mould under a port wheel to go out of No. 3's path long before the time of collision if her master had known that anything was the matter, and that porting was necessary. It is evident that he did not know this until No. 3 was near; and it would be absurd to hold that No. 3 was bound to take measures to avoid collision or had knowledge of any need of doing so, any earlier than the Mould herself. My conclusion is that neither knew the real difficulty in time to avoid collision; and that it is to be set down therefore to pure accident, and not to any fault of No. 3's.

The libel is therefore dismissed, but without costs.